YUSUF BROWN,

     Plaintiff,

                                Civil Action 2:10-cv-822
     v.                          Judge Gregory L. Frost
                                Magistrate Judge Elizabeth P. Deavers

WARDEN ROSS CORRECTIONAL
INSTITUTION, et al.,

     Defendants.


## ORDER AND REPORT AND RECOMMENDATION

This is a civil rights action under 42 U.S.C. § 1983 in which Plaintiff, Yusuf Brown, an

African-American inmate in state custody who is proceeding without the assistance of counsel,

alleges that employees of Ross Correctional Institution ("RCI") (collectively "Defendants") have

conspired to implement an unwritten policy of assigning cellmates on the basis of race in

violation of his right to equal protection under the Fourteenth Amendment.  Plaintiff also alleges

that Defendants have engaged in a number of retaliatory acts, failed to protect him, and

demonstrated deliberate indifference to his serious medical needs in violation of his

constitutional rights.  This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's Motion for Partial Summary Judgment (ECF No. 114) and

Defendants' Cross-Motion for Summary Judgment (ECF No. 129).  For the reasons stated

below, the undersigned **RECOMMENDS** that the Court **DENY** Plaintiff's Motion for Partial

Summary Judgment and **GRANT** Defendants' Cross-Motion for Summary Judgment.  The

Court has also considered Defendants' Motion to Strike Plaintiff's Sur-Reply (ECF No. 146),

Plaintiff's Request for Leave of Court to File Sur-Reply (ECF No. 147), and Plaintiff's Motion to Have the Ohio Department of Rehabilitation and Corrections Held in Contempt of Court for First Amendment Violations. (ECF No. 150). As set forth herein, Defendants' Motion to Strike (ECF No. 146) and Plaintiff's Motion for Contempt (ECF No. 150) are **DENIED,** and Plaintiff's Request for Leave (ECF No. 147) is **GRANTED**.

## I. BACKGROUND

Plaintiff, in his Amended/Supplemental Complaint, asserts claims against more than twenty RCI officials and employees. In their Cross-Motion for Summary Judgment, Defendants submit that Plaintiff properly exhausted his administrative remedies before bringing suit only with regard to a single claim against RCI's Warden, Defendant Jeffreys. Defendants maintain that the Court must dismiss these unexhausted claims for failure to satisfy the exhaustion requirements set forth in the Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a). As explained below, resolution of this issue requires the Court to carefully examine the timing and content of any exhausted grievances; the timing and claims asserted in Plaintiff's Complaint; and the timing and claims raised in his Amended/Supplemental Complaint.

### A. Plaintiff's Exhausted Grievances

During his incarceration at RCI, Plaintiff fully exhausted his administrative remedies eight times. The Court examines each of these exhausted grievances in turn.

Plaintiff exhausted Grievance Number CI-06-10-007 ("First Grievance") on August 23, 2010. (*See* Aug. 23, 2010 Decision of Chief Inspector, ECF No. 132 at 10.) Plaintiff initiated his First Grievance when he filed a direct grievance against Warden Jeffreys, alleging that Jeffreys had "engaged in or encouraged an institution-wide policy of racial segregation," such that "cell segregation is automatic." (Not. of Grievance, ECF No. 132 at 9.) In concluding that

Plaintiff's grievance lacked merit, the Chief Inspector found that RCI does not utilize race as a factor in bed assignments and that RCI had numerous racially integrated cells. The Chief Inspector also noted that Plaintiff's direct grievance failed to clearly indicate how Warden Jeffreys was personally and knowingly involved.

Plaintiff exhausted Grievance Number RCI-09-10-000040 ("Second Grievance") on November 18, 2010. (*See* Nov. 18, 2010 Decision of Chief Inspector, ECF No. 132 at 15.) Plaintiff initiated his Second Grievance when he filed a Notification of Grievance, complaining that Captain Posey, Lieutenant Lunsford and Mr. Pence placed him in segregation multiple times without cause in retaliation for his utilization of the grievance procedure. He represented that Lunsford and another Captain told him that he had been placed in segregation for complaining and talking too much. Plaintiff also complained that unnamed correctional officers allowed his property to be stolen twice during his move to segregation. The Inspector of Institutional Services rejected Plaintiff's grievance, finding that on each of the days Plaintiff was placed in segregation, a corresponding conduct report was issued with the exception of an investigation of August 26, 2010, through September 3, 2010. He elaborated as follows:

> On 5/24/10, you were placed into security control for possession of a weapon; on 9/8/10, you were placed into security control for being out of place; and on 9/17/10 you were placed in security control for dealing. The investigation for which you were placed into security control was a result of you initiating contact with security supervisors claiming to have information about a proposed sit down strike and claim[ing] you have the rank and authority to stop it in exchange for specific concessions. . . . You were released without a conduct report.

(Oct. 6, 2010 Disp. of Grievance, ECF No. 132 at 12.) The Inspector noted that both Pence and Posey denied having a conversation with Plaintiff regarding writing too many complaints. He also rejected Plaintiff's complaints regarding his property, indicating that Plaintiff was required to file a theft/loss report with staff members on duty upon discovering missing items. Plaintiff

appealed the Inspector's denial to the Chief Inspector, adding that the conduct reports were ridiculous and could easily be proven false. The Chief Inspector upheld the Inspector's rejection of Plaintiff's Second Grievance, finding that the evidence did not support Plaintiff's contention that he had been placed in retaliation for utilizing the inmate grievance procedure.

Plaintiff exhausted Grievance No. RCI-10-10-000001 on November 16, 2010 ("Third Grievance"). (*See* Nov. 16, 2010 Decision of Chief Inspector, ECF No. 132 at 20.) In this Third Grievance, Plaintiff again complained that Posey and Lunsford retaliated against him for utilizing the inmate grievance procedure. More specifically, he alleged that on September 17, 2010, Captain Posey, in the presence of Lieutenant Lunsford, yelled "I'm going to break you of writing stuff against me." (Not. of Grievance, ECF No. 132 at 16.) He further alleged that Lunsford subsequently issued a false conduct report to justify his placement in segregation. The Inspector rejected Plaintiff's Third Grievance. On appeal, the Chief Inspector affirmed the Inspector's denial.

Plaintiff exhausted Grievance No. CI-10-10-000021 on December 14, 2010 ("Fourth Grievance"). (*See* Dec. 14, 2010 Decision of Chief Inspector, ECF No. 132 at 22.) On October 13, 2010, Plaintiff filed his Fourth Grievance directly to the Chief Inspector, alleging that "in the last few months" Warden Jeffreys had repeatedly threatened to transfer him to another institution for being "high maintenance." (Not. of Grievance, ECF No. 132 at 21.) Plaintiff indicated that he interpreted Warden Jeffrey's threat of transfer as retaliation for filing grievances and a lawsuit. He asserted that Warden Jeffreys "told RCI staff of his threat, which has given them an endorsement and approval to openly retaliate." (*Id.*) More specifically, Plaintiff expressed that Warden Jeffrey's threats constituted "an endorsement and approval" of RCI staff's retaliation in the form of false conduct reports and conviction on the charges in the false conduct reports. (*Id.*)

Plaintiff also added that unnamed RCI staff members were "forcing [him] to cell with inmates that they believed [would] fight with [him], such as members of rival gangs," and encouraging Plaintiff and his cellmate "to kill each other." (*Id*.) The Chief Inspector denied Plaintiff's Fourth Grievance.

Plaintiff exhausted Grievance No. CI-02-11-000003 on February 8, 2011 ("Fifth Grievance"). (*See* Feb. 8, 2011 Decision of Chief Inspector, ECF No. 132 at 24.) In his Fifth Grievance, Plaintiff again directly complained to the Chief Inspector about RCI's alleged policy of racial segregation of cells. The Chief Inspector denied Plaintiff's Fifth Grievance, noting that it was duplicative of his First Grievance.

Plaintiff exhausted Grievance No. RCI-03-11-000090 on May 11, 2005 ("Sixth Grievance"). (*See* May. 11, 2011 Decision of Chief Inspector, ECF No. 132 at 29.) Plaintiff filed this grievance against Mr. Pence on March 14, 2011, stating the following:

> A few days ago I was attacked and stabbed multiple times by three white inmates on my way to breakfast.
>
> The following day I was visited by my Unit Manager Pence who told me that he would try to prove that it was my fault I got stabbed and that he would find a reason to write me a conduct report. He also stated that he had an idea who the other two inmates who attacked me were but he wasn't going to do anything towards them [be]cause he was going to hold a hearing to transfer me and if I refused he said maybe they would kill me next time.

(Not. of Grievance, ECF No. 132 at 25.) Plaintiff added that he believed Pence wanted to help the inmates who attacked him because they were white and he was black. Plaintiff indicated that he no longer felt safe around Pence. The Inspector denied Plaintiff's grievance. On appeal, the Chief Inspector affirmed the Inspector's denial.

Plaintiff exhausted Grievance No. RCI-03-11-000091 on May 11, 2011 ("Seventh Grievance"). (*See* May 11, 2011 Decision of Chief Inspector, ECF No. 132 at 34.) In this

grievance, Plaintiff alleged that Pence had been telling inmates that they could have Plaintiff's property if they agreed to say it was stolen. Plaintiff again complained that Pence was trying to help the inmates who stabbed him come up with a story to justify their actions because they are white and he is black. Plaintiff alleged that the day after the stabbing incident, Pence told him that he was going to prove that the stabbing was his fault. Plaintiff again indicated that he no longer feels safe around Pence. The Inspector denied Plaintiff's Seventh Grievance, noting that it was substantially similar to Plaintiff's Sixth Grievance. On appeal, the Chief Inspector affirmed the Inspector's denial.

Plaintiff exhausted Grievance No. CI-04-11-000036 on June 24, 2011 ("Eighth Grievance"). (*See* June 24, 2011 Decision of Chief Inspector, ECF No. 132 at 37.) Plaintiff directly filed his Eighth Grievance with the Chief Inspector, alleging that Warden Jeffreys demonstrated deliberate indifference to his serious medical needs in retaliation for Plaintiff filing grievances and a civil action. Plaintiff represented that when Jeffreys saw him outside of his cell in flexible, plastic handcuffs, he ordered the correctional officers to remove those handcuffs and use regular handcuffs anytime Plaintiff left his cell. Plaintiff alleged that Jeffreys subsequently directed his doctor to change his orders to permit utilization of regular handcuffs every time Plaintiff left his cell. The Chief Inspector denied Plaintiff's grievance.

**B.    Plaintiff's Complaint**

On September 14, 2010, Plaintiff initiated this action, moving for leave to proceed *in forma pauperis* and attaching his Complaint. In his Complaint, Plaintiff names Warden Jeffreys and the former RCI Warden, Michael Sheets in both their individual and official capacities. Plaintiff also names "[a]ll [RCI] officials, officers, agents, and employees" in their individual and official capacities, whom he explains he names because the "complete listing of names is

presently unknown" and whom he later references as "John and Jane Does." (Compl. 6–7, ECF No. 9.) In total, Plaintiff's Complaint references eleven John Does and two Jane Does.

Plaintiff alleges that Defendant Sheets instituted an unwritten policy of racially segregating all two-person cells at RCI that Defendant Jeffreys continues to practice. He further alleges that Defendants Sheets and Jeffreys conspired with RCI staff to implement the racial segregation policy. He contends that this policy created a culture of racial discrimination and harassment and promoted racial tension and violence. In support of this contention, Plaintiff alleges that John Doe Numbers One (identified in his Amended Complaint as Sergeant Spencer), Two (still unidentified), and Three (identified in his Amended Complaint as Corrections Officer Jones) placed him in cells with members of rival gangs on four different occasions because there were no other "black cells" available. (Compl. 10–11, ECF No. 9.) Plaintiff alleges that this led to two unreported fights. According to Plaintiff, when he refused his cell assignment, John Doe Number Two issued him a conduct report and put him in segregation. Another time when he tried to refuse, John Doe Number Four (identified in his Amended Complaint as Lieutenant Browning) told him that he could not move "because only 'white-cells' were available." (*Id.* at 11.) He also represents in his Complaint that Defendant Lieutenant Browning, John Doe Number Nine (identified in his Amended Complaint as Corrections Officer Barnett), and John Doe Number Eight (identified in his Amended Complaint as Corrections Officer Sykes), among others, would make racially offensive remarks. He indicates that John Doe Number Five (identified in his Amended Complaint as RCI Unit Manager Pence), John Doe Number Six (identified in his Amended Complaint as Charlie Heiss, the Administrative Assistant to Warden Jeffreys), and Jane Doe Number One (identified in his Amended Complaint as Lieutenant A. Lunsford) had asked him on different occasions whether he could do anything to help stop the

"Race War." (*Id*. at 12.)  Plaintiff alleges that he later told them that it would help if they would

stop racially segregating cells and harassing black inmates.  He asserts that Defendants' actions

violate his constitutional right to equal protection under the Fourteenth Amendment.

Plaintiff also asserts retaliation claims against a number of Defendants.  He represents

that Corrections Officer Barnett, John Doe Number Ten (identified in his Amended Complaint as

Corrections Officer Montgomery), RCI Unit Manager Pence, and other unknown RCI

Defendants issued false conduct reports, causing Plaintiff to be placed in segregation, in

retaliation for his utilization of the inmate grievance system.  He alleges that Pence placed him in

segregation multiple times without any justification beyond "that [P]laintiff was complaining and

writing grievances too much."  (Compl. 17, ECF No. 9.)  He further alleges that Pence "made it

perfectly clear, by words and actions, that he is upset about [Plaintiff] filing racial discrimination

complaints and let it be known that he would continue his retaliation."  (*Id*.)  He similarly alleges

that Montgomery allowed inmates to put a weapon in his cell so that he would be placed in

segregation.  He says that Montgomery and other unnamed RCI staff gave his property to other

inmates or allowed other inmates to take his property when he was being moved into

segregation.

Finally, Plaintiff alleges that RIB members John Doe Number 11 (identified in his

Amended Complaint as Lieutenant Cockrell) and Jane Doe Number Two violated several of

RCI's own procedures so that it could convict him of the conduct alleged in the false conduct

reports.  Specifically, Plaintiff alleges that procedures he disregarded included a delay in

scheduling the hearing; failure to send Plaintiff for a mental health assessment prior to the

hearing; and having insufficient number of RCI staff on the panel.  Plaintiff alleges that after the

hearing, Cockrell told Plaintiff that he was convicted for filing the race-related grievances rather

than for his alleged rule violations. Plaintiff says that on appeal, Heiss upheld his convictions even though he acknowledged that Plaintiff probably did not do anything wrong. Plaintiff alleges that Heiss told him that he would release him from segregation after thirty days rather than six months if Plaintiff stopped complaining.

## C.    Plaintiff's Amended/Supplemental Complaint

On June 13, 2011, Plaintiff moved to amend or supplement his Complaint, proffering his proposed Amended/Supplemental Complaint. (ECF No. 84.) The Court granted Plaintiff's motion to amend on July 7, 2011, directing the clerk to file his Amended/Supplemental Complaint. (ECF No. 88.)

In his Amended/Supplemental Complaint, Plaintiff names the following RCI officials or employees in their individual and official capacities: Michael Sheets, former RCI Warden; Rob Jeffreys, current RCI Warden; Charlie Heiss, Warden's administrative assistant; Jeff Lisath, Deputy Warden of Operations; Jon Pence, RCI Unit Manager; Dr. Krisher, doctor who treated Plaintiff's injuries; B. Posey, RCI Captain; Albert Price, RCI Segregation Supervisor; Jeanetta Turner, Count Office Supervisor; Browning, RCI Lieutenant; Rich Cockrell, RCI Lieutenant and RIB Chairman; William E. Fuller, RCI Sergeant; C. Spencer, RCI Sergeant; A. Lunsford, RCI Lieutenant; Sykes, RCI Corrections Officer; Barnett, RCI Corrections Officer; Montgomery, RCI Corrections Officer; Bill Letts, RCI Corrections Officer; D. Leggs, RCI Corrections Officer; and Jones, RCI Corrections Officer. He also names two John Does, one Jane Doe, and "[a]ll officials officers, agents and employees of [RCI]" in their official capacities for their role in cooperating and enforcing the alleged racial segregation policy. He again brings equal protection and retaliation claims and adds failure to protect and medical indifference claims.

### 1.    Equal Protection Claims

Plaintiff asserts equal protection claims against Defendant Sheets, Jeffreys, Pence, Price, Browning, Turner, Cockrell, Fuller, and Spencer.

In his Amended/Supplemental Complaint, as in his original Complaint, Plaintiff alleges that Defendant Sheets instituted an unwritten policy of racially segregating all two-person cells at RCI, a policy which Defendant Warden Jeffreys continues to practice.  He again alleges that Defendants Sheets and Jeffreys conspired with RCI staff to implement the racial segregation policy.  According to Plaintiff, Defendant Sheets told him that RCI employed automatic racial segregation of cells "to prevent problems with inmates."  (Am. Compl. 5, ECF No. 88.)  Plaintiff says that after Jeffreys became the RCI Warden, Jeffreys told him that he did not have a problem with the automatic racial segregation, just with "racial bunching," or having a row of cells with only one race.  (*Id*.)

Plaintiff alleges that Defendants Turner and Price, by virtue of their positions, are liable for violations of his equal protection rights because they are responsible for automatically placing Plaintiff in "black cells" and enforcing the unwritten policy of automatic racial segregation.  (*Id*. at 12.)  He alleges that Defendants Browning, Jones, Pence, and Fuller refused to move Plaintiff to a different cell even though he was placed with a rival gang member because only "white cells" were available.  (*Id*. at 13, 14.)  Similarly, Plaintiff alleges that Spencer denied his request to cell with a specific inmate because that inmate was Caucasian.

## 2.      Retaliation Claims

Plaintiff asserts First Amendment retaliation claims against Defendants Jeffreys, Heiss, Pence, Posey, Lunsford, Cockrell, Fuller, Letts, Montgomery, Sykes, Barnett, and Leggs, alleging that these individuals retaliated against him for his utilization of the inmate grievance process and filing lawsuits.

According to Plaintiff's Amended/Supplemental Complaint, after Plaintiff began filing grievances regarding the alleged racial segregation policy, Warden Jeffreys "began openly threatening [him] with a transfer and also physical violence," referring to him as "high maintenance" for filing too many complaints.  (*Id*. at 6.)  Plaintiff contends that in making these statements, Jeffreys implicitly "gave RCI permission to openly retaliate against Plaintiff."  (*Id*.)  He therefore concludes that Jeffreys "condoned and facilitated" all of the other retaliatory acts that he alleges RCI employees committed against him.  Plaintiff asserts that "with de facto permission from Defendant Jeffreys," Defendants Posey, Lunsford, Sykes, Barnett, Letts, and Leggs began a "campaign of retaliation."  (*Id*. at 16–17.)

Plaintiff alleges that Defendants Lunsford, Posey, Barnett, Montgomery, Letts, Leggs, Pence, and other unnamed RCI employees filed false conduct and incident reports against him in retaliation for filing grievances and the lawsuit about the racial segregation.  More specifically, he alleges that Lunsford and Posey issued a conduct report charging him with "dealing" because his sister sent him a box of clothes.  (*Id*. at 16.)  Plaintiff says that in that conduct report, Lunsford and Posey indicated that he confessed to a number of different felonies even though they did not charge him with any of the violations about which he purportedly confessed to.  He also alleges that Montgomery allowed an inmate to put a weapon in his cell to set him up for a conduct report and discipline.  In addition, Plaintiff alleges that Letts wrote a false conduct

report charging Plaintiff with theft. Finally, Plaintiff alleges that on March 15, 2011, Pence filed a false conduct report against him for "dealing" and that the RIB found him "not guilty" of the charge on March 22, 2011. (*Id*. at 10–11.)

It appears that Plaintiff's retaliation claim against Heiss, a RIB designee, is premised upon his alleged failure to stop RCI employees from continuing to issue false conduct reports against him or upon his alleged failure to find Plaintiff innocent of charges in those reports. According to Plaintiff, Heiss assured him that he would make sure that RCI staff would stop issuing false conduct reports if he would stop complaining of racial segregation. Similarly, Plaintiff alleges that Cockrell wrongfully convicted him of the charges alleged in conduct reports that he knew to be false in retaliation for complaining about racial segregation.

Plaintiff also asserts retaliation claims against Defendants Sykes, Barnett, Letts, and Leggs, alleging that they conducted excessive searches on Plaintiff's body and cell. He alleges that Sykes and Barnett made racially offensive comments and that Fuller, Letts, and Montgomery allowed other inmates to take his property when he would go to segregation. He indicates that Montgomery told him that he would loose more property if he continued complaining about racial segregation. Finally, Plaintiff alleges that Pence and Fuller placed him in cells and cellblocks where other inmates wanted to harm him in retaliation for his utilization of the grievance process.

### 3.     Failure to Protect Claims

Plaintiff asserts Eighth Amendment claims against Defendants Jeffreys, Lisath, Pence, Price, Turner, Browning, and Fuller, alleging that these individuals knowingly and repeatedly placed Plaintiff in dangerous situations.

According to Plaintiff's Amended/Supplemental Complaint, Pence and Fuller placed him in cells and cellblocks with inmates that they knew wanted to harm him.  On February 5, 2011, Plaintiff was placed in isolation after corrections officers observed "a crowd of inmates [who] wanted to physically harm" him.  (*Id*. at 9.)  When Plaintiff complained about being placed in segregation, Pence explained to him that he was placed in isolation due to concerns about his safety.  A week later, Plaintiff was released from isolation and placed into a cell with an inmate with whom he had previously gotten into an unreported fight with.  Several weeks later, on March 7, 2011, three Caucasian inmates attacked Plaintiff while he was on his way to breakfast, stabbing him multiple times.  Plaintiff alleges that after the attack, Pence told him that it was his "own fault that he was attacked and stabbed" and that he "would find a reason to issue a disciplinary conduct report against [him] to prove" it.  (*Id*. at 10.)  Plaintiff maintains that Pence knows the identities of his attackers, but will not divulge them.

Plaintiff alleges that for nearly three months prior to the March 7, 2011 attack, he wrote letters to Defendants Lisath and Jeffreys, complaining that Defendants Pence and Fuller were placing him in cells with rival gang members.  Plaintiff further alleges that although Lisath investigated, he took no action or would refer his complaints to Pence even though he knew it was Pence who was responsible for placing him in the dangerous cell or cellblock.  Plaintiff attributes his assault, in part, to Defendant Lisath's failure to take action to protect him.

## 4. Medical Indifference Claims

Plaintiff asserts medical indifference claims against Warden Jeffreys and Dr. Krisher. Dr. Krisher treated Plaintiff for injuries he sustained to his arm from the March 7, 2011 attack. Dr. Krisher gave Plaintiff a splint for his arm. Because Plaintiff's arm was in a splint, the corrections officers transporting him used flexible, plastic handcuffs instead of regular handcuffs. According to Plaintiff, when Jeffreys observed this, he directed Dr. Krisher to change Plaintiff's medical order to allow for removal of the splint during transport so that regular handcuffs could be used. Plaintiff alleges that Jeffreys' order to Dr. Krisher demonstrated medical indifference to his serious medical needs and that Jeffreys acted out of retaliation for his filing of grievances and this lawsuit. Plaintiff posits that Dr. Krishers' agreement to change his orders also amounted to unconstitutional medical indifference.

## D. Pending Motions

On January 9, 2012, Plaintiff filed a partial motion for summary judgment, seeking an entry of judgment in his favor with regards to his medical indifference and retaliation claims against Defendants Jeffreys and Krisher arising from their alleged order to allow for removal of his splint and his failure to protect and his retaliation claims against Defendants Jeffreys, Lisath, and Pence arising from their failure to protect him from the March 7, 2011 assault. (ECF No. 114.) Defendants responded to Plaintiff's Motion and filed their Cross-Motion for Summary Judgment on March 20, 2012. (ECF No. 129.) In their Cross-Motion for Summary Judgment, Defendants submit that the Court must dismiss all but one of Plaintiff's claims based upon his failure to properly exhaust his administrative remedies. Defendants alternatively maintain that they are entitled to judgment as a matter of law on each of Plaintiff's claims. Plaintiff filed his Reply in support of his Partial Motion for Summary Judgment and Memorandum in Opposition

to Defendants' Motion on May 14, 2012.  (ECF No. 140.)  On May 29, 2012, Defendants filed their Reply in Support of their Cross-Motion for Summary Judgment.  (ECF No. 141.) Plaintiff, without leave of court, filed a Response to Defendants' Reply.  (ECF No. 144.) Defendants moved to strike Plaintiff's Response, noting that Plaintiff did not first seek leave to file a sur-reply and asserting that he "has no good cause to even seek the Court's permission." (Defs.' Mot. to Strike 3, ECF No. 146.)  In his June 27, 2012 Response to Defendants' Motion to Strike, Plaintiff acknowledges that he improperly filed a sur-reply without leave.  (ECF No. 147.)  He asks the Court to accept his proffered sur-reply, asserting that it is "necessary" because Defendants raised new arguments in their Reply regarding exhaustion.  (*Id*. at 1.)  Defendants filed their Reply in Support of Their Motion to Strike on June 28, 2012, asserting that their Reply did not raise new grounds to support their Cross-Motion for Summary Judgment, but instead merely addressed the arguments Plaintiff raised in his Response.  (ECF No. 148.)

On August 8, 2012, Plaintiff filed a Motion to Have the Ohio Department of Rehabilitation and Corrections Held in Contempt of Court for First Amendment Violations. (ECF No. 150.)  In this Motion, Plaintiff asks the Court to hold the Ohio Department of Rehabilitation and Correction ("ODRC") in contempt for permitting its employees to withhold property and medical care from him in an attempt to get him to withdraw the instant action. More specifically, Plaintiff accuses unnamed staff members at the Trumbull Correctional Institution ("TCI") and the Allen-Oakwood Correctional Institution ("AOCI") of taking this actions against him.

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, No. 10–3110, 2011 WL 4469612, at *3 (6th Cir. Sept. 28, 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## III.    ANALYSIS

As a preliminary matter, Plaintiff's Request for Leave of Court to File Sur-Reply (ECF No. 147) is **GRANTED,** and Defendants' Motion to Strike (ECF No. 146) is **DENIED**. Although Defendants correctly assert that they did not raise a new "ground" for summary judgment in their Reply, they raised new arguments in support of their assertion that the Court must dismiss most of Plaintiff's claims because he did not properly exhaust them. Accordingly, in ruling on the parties' summary judgment motions, the Court will consider Plaintiff's Response to Defendants' Reply (ECF No. 144).

The undersigned now considers Defendants' exhaustion arguments before turning to the parties' respective arguments in favor of summary judgment on the merits with regard to Plaintiff's claims that have arguably been properly exhausted as well as Plaintiff's recently filed Motion for Contempt.

### A.    Exhaustion of Administrative Remedies

Defendants contend that the PLRA "demands" that this Court dismiss any claims that Plaintiff failed to fully and properly exhaust prior to initiating suit. (Defs.' Cross Mot. for Summ. J. 1, ECF No. 129.)  Because Plaintiff exhausted just one claim before initiating this action—his equal protection claim against Warden Jeffreys arising from the alleged racial segregation policy—Defendants maintain that this Court must dismiss "every other claim against every other Defendant." (*Id.*)  Under Defendants' interpretation of the PLRA, a plaintiff cannot file an amended or supplemental complaint raising claims that he or she exhausted after initiating the lawsuit.  Even if the Court rejects Defendants' constrained reading of 42 U.S.C. § 1997(e), the undersigned concludes that Defendants have demonstrated that Plaintiff has failed to properly exhaust his administrative remedies with regards to most of his claims.

### 1.    Exhaustion Under the PLRA

"A prisoner's failure to exhaust his intra-prison administrative remedies prior to filing suit 'is an affirmative defense under the PLRA . . . .'" *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) (quoting *Jones v. Bock*, 549 U.S. 199, 216 (2007)). Defendants bear the burden of proof on the affirmative defense of exhaustion. *Napier v. Laurel County, Ky.*, 636 F.3d 218, 225 (6th Cir. 2011) (citations omitted) ("[F]ailure to exhaust administrative remedies under the PLRA is an affirmative defense that must be established by the defendants."). "Summary judgment is appropriate only if defendants establish the absence of a genuine dispute as to any material fact regarding non-exhaustion." *Surles*, 678 F.3d at 455. "When a prisoner's complaint contains a combination of exhausted and unexhausted claims, courts are to dismiss the unexhausted claims but retain and address the exhausted claims." *Reynolds-Bey v. Harris*, 428 F. App'x 493, 500 (6th Cir. 2011) (citing *Jones*, 549 U.S. at 220–24).

Under 42 U.S.C. § 1997e(a), as amended by the PLRA, "a prisoner confined in any jail, prison, or other correctional facility" may not bring an action challenging "prison conditions" under 42 U.S.C. § 1983 "or any other Federal law . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Jones*, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (citation omitted)). This mandatory exhaustion requirement applies to all lawsuits relating to prison conditions, regardless of the nature of the wrong or the relief sought. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). "Exhaustion" under the PLRA means "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). To properly exhaust, prisoners must "tak[e] advantage of each step the prison holds out for resolving the claim internally and . . . follow the 'critical procedural rules' of the prison's grievance process to permit prison officials

to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010); *Jones*, 549 U.S. at 217–18 (noting that proper exhaustion requires "[c]ompliance with prison grievance procedures").

Notwithstanding concerns of judicial efficiency, a plaintiff who pleads unexhausted or improperly exhausted claims cannot come into compliance with the PLRA's exhaustion requirements by simply re-pleading those claims in an amended complaint after proper exhaustion. *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) (holding that improperly exhausted claims pled in the complaint could not be subsequently exhausted during the pendency of the action); *Fisher v. Ohio Dep't. of Corr.*, No. 1:06-cv-559, 2009 WL 2246183, at *5 (S.D. Ohio July 23, 2009) (rejecting inmate's assertion that he should be permitted to proceed on claims advanced in his complaint that were not exhausted but that were exhausted prior to his re-pleading them in his third amended complaint); *Cesal v. Bureau of Prisons*, No. 04-CV-281, 2006 WL 2803057, at *4 (E.D. Ky. Sept. 28, 2006) ("Any claim that is not exhausted at the time of filing must be dismissed without prejudice, notwithstanding its subsequent exhaustion during the pendency of the case.") Allowing an inmate to simply re-plead improperly exhausted claims would encourage circumvention of the PLRA's exhaustion-first rule, undermining one of the two main purposes that exhaustion serves—to "give[] an agency an opportunity to correct its own mistakes . . . before it is haled into federal court and . . . discourage[] disregard of the agency's procedures." *Woodford*, 548 U.S. at 89. Thus, to the extent Plaintiff included improperly exhausted claims in his original Complaint, he cannot subsequently exhaust those claims during the pendency of this action. Rather, this Court must dismiss such claims without prejudice.

As set forth above, this case presents the issue of whether the PLRA permits an inmate

to assert new claims premised upon new factual allegations in an amended or supplemental complaint so long as those claims are fully and properly exhausted at the time the plaintiff first presents them to the court. Defendants maintain that an inmate may not amend or supplement his or her complaint to bring claims that were not exhausted prior to the inmate's initiation of the action. Under Defendants' interpretation, prisoners cannot amend their complaint to add newly exhausted claims. Instead, they must file a new action that presumably could be consolidated with the pending action.

There is some authority supporting Defendants' interpretation on this issue, but subsequent Supreme Court precedent calls this authority into question. *See Utley v. Campbell*, 84 F. App'x 627, 629 (6th Cir. 2003) ("The district court properly noted that [the inmate] had not exhausted his administrative grievances of the claims he sought to add until after this case was filed, and therefore they could not be appended to this litigation."); *Friske v. Scutt*, No. 07-13747, 2008 WL 4857963, at *1 (E.D. Mich. Nov. 6, 2008) (relying on *Utley* to conclude that the new claims the inmate asserted in the proposed amended complaint could not proceed where it was "readily apparent from the face of the proposed amended complaint that [the inmate] did not exhaust his administrative remedies before the instant suit was filed"). In *Utley*, however, the United States Court of Appeals for the Sixth Circuit's opinion on this issue was delivered in a single line, without any accompanying analysis. 84 F. App'x at 629. Moreover, *Utley* was decided before the United States Supreme Court rejected the Sixth's Circuit's rigid, plain-language interpretation of the PLRA's exhaustion provision. *See Jones*, 549 U.S. at 212–13, 220–24 (rejecting Sixth Circuit's interpretation of the PLRA's exhaustion language, emphasizing that "courts should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns" and that §1997e(a)'s "statutory phrasing—'no

action shall be brought'—is boilerplate language").

Several courts, including trial courts within this Circuit, have rejected Defendants' constrained interpretation, instead concluding that fully and properly exhausted claims presented for the first time in an amended or supplemental complaint do not run afoul of §1997e(a). *See*, *e.g.*, *Rhodes v. Robinson*, 621 F.3d 1002, 1006–07 (9th Cir. 2010) (holding that "[t]he PLRA's exhaustion requirement is satisfied so long as [an inmate] exhaust[s] his administrative remedies with respect to the new claims asserted in [an amended complaint] before . . . tender[ing] that complaint to the court for filing"); *Smith v. Olsen*, 455 F. App'x 513, 515–16 (5th Cir. 2011) (permitting inmate to proceed on § 1983 claims that he exhausted after he initiated suit, but before he first advanced them in an amended complaint, emphasizing that the claims were "new claims" premised upon "new factual allegations"); *Cannon v. Washington*, 418 F.3d 714, 719 (7th Cir. 2005) (permitting inmate to amend complaint to assert new § 1983 claims against new defendants even though those claims arose before the inmate had initiated suit where the inmate had properly exhausted the new claims before proffering them to the court in an amended complaint); *Israfil v. Woods*, No. 1:09-cv-468, 2011 WL 8006371, at *16 (S.D. Ohio Dec. 7, 2011) (permitting inmate to proceed on an excessive force incident that arose and was not exhausted prior to initiation of suit, but that was raised for the first time in an amended complaint after exhaustion). *Cf. Mathis v. GEO Group, Inc*., No. 2:08-CT-21-D, 2011 WL 2899135, at *5–6 (E.D. N.C. July 18, 2011) (permitting amendment to add new plaintiffs where the new plaintiffs had exhausted their administrative remedies before joining the action).

Other courts reject Defendants' interpretation, but only permit supplementation of newly exhausted claims if those claims arose after the complaint. *See, e.g.*, *Lee v. Birkett*, No. 09-

10723, 2009 WL 3465210, at *2 (E.D. Mich. Oct. 23, 2009) (concluding that an inmate is entitled to supplement his complaint "to add new claims, based on events occurring subsequent to the filing of the original complaint, which appear fully exhausted at the time first asserted in the proposed complaint"); *Jordan v. Caruso*, No. 2:08-CV-261, 2010 WL 3220143, at *12 (W.D. Mich. Aug. 10, 2010) (noting that an inmate "could plausibly argue that a new claim . . ., arising after the complaint, could be exhausted before filing the amended complaint"); *Romano v. Secretary Doc.*, No. 2:06-cv-375, 2011 WL 1790125, at *4 (M.D. Fla. May 10, 2011) (concluding that inmate satisfied the PLRA's exhaustion requirements where his amended complaint added new claims "that did not exist at the time [the inmate] filed his initial complaint" and that were "properly exhausted prior to his filing his . . . [a]mended [c]omplaint"); *cf. Green v. Dep't of Corr.*, 393 F. App'x 20, 24 (3d Cir. 2010) (affirming trial court's dismissal of unexhausted claim, distinguishing it from "a case where the cause of action did not yet exist at the time [the inmate] filed the original complaints").

Because of the conflicting authority on this issue, the undersigned declines to recommend dismissal on exhaustion grounds with regard to claims Plaintiff exhausted after filing this action but before he first advanced them in his Amended/Supplemental Complaint. It is unnecessary, however, for the undersigned to definitively conclude that these claims are properly exhuausted because regardless, the undersigned concludes that these claims lack merit. *See Woodford*, 548 U.S. at 101 ("[T]he PLRA exhaustion requirement is not jurisdictional, . . . thus allowing a district court to dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies.").

## 2. Ohio's Grievance Procedure

Ohio has established a procedure for resolving inmate complaints. Ohio Admin. Code § 5120–9–31. To properly exhaust a claim seeking relief "regarding any aspect of institutional life that directly and personally affects the [inmate]," an inmate at an ODRC facility must comply with its three-step grievance system. *Id.* For the first step, the inmate must submit an informal complaint to the staff member or to the direct supervisor of the staff member or to the department most directly responsible over the subject matter with which the inmate is concerned. Ohio Admin. Code § 5120–9–31(K)(1). If the inmate is not satisfied with the results at the first step, he may take the second step by filing a formal grievance with the inspector of institutional services at the prison where he is confined. Ohio Admin. Code § 5120–9–31(K)(2). That inspector will investigate the matter and issue a written response to the inmate's grievance within fourteen calendar days of receipt. *Id.* If the inmate is still dissatisfied, he may pursue the third step, which is an appeal to the office of the Chief Inspector of ODRC. Ohio Admin. Code § 5120–9–31(K)(3). An inmate does not exhaust his remedies under § 5120-9-31 until he has received a decision in an appeal to the office of the Chief Inspector. If an inmate has a grievance against the warden or inspector of institutional services, he must file it directly to the office of the Chief Inspector, whose decision is final. Ohio Admin. Code § 5120–9–31(M).

## 3. Application

Even if this Court were to adopt the most expansive interpretation of the PLRA's exhaustion requirements to conclude that fully and properly exhausted claims presented for the first time in an amended or supplemental complaint do not run afoul of §1997e(a), only the following claims in Plaintiff's Amended/Supplemental Complaint would be properly exhausted:

(1) his equal protection claim against Defendant Jeffreys concerning his unwritten policy of automatic cell segregation; (2) his retaliation claims against Defendants Posey and Lunsford concerning their filing of a false conduct report resulting in his placement in segregation on September 17, 2010; and (3) his retaliation claim against Defendant Jeffreys relating to his transfer threats. Prior to initiating this action on September 14, 2010, Plaintiff had only exhausted his First Grievance. He filed this grievance against Warden Jeffreys, alleging that he had "engaged in or encouraged an institution-wide policy of racial segregation" such that "cell segregation is automatic." (Not. of Grievance, ECF No. 132 at 9.) After initiating this action, Plaintiff filed his Third Grievance, alleging that on September 17, 2010, Defendants Posey and Lunsford filed a false conduct report against him so that they could justify placing him in segregation in retaliation for his utilization of the inmate grievance procedure. He exhausted this claim prior to seeking to amend his Complaint and added this claim against Posey and Lunsford in his Amended/Supplemental Complaint. Likewise, Plaintiff exhausted his retaliation claim against Warden Jeffreys concerning his alleged threats to transfer Plaintiff for being "high maintenance" prior to advancing it for the first time in his Amended/Supplemental Complaint. (Fourth Grievance, ECF No. 132 at 22.). The undersigned, therefore, considers the parties' respective arguments in favor of summary judgment on the merits for each of these claims below.

The other claims Plaintiff asserts in his Amended/Supplemental Complaint were either never properly exhausted or are claims he failed to properly exhausted before first presenting them to this Court. For example, Plaintiff exhausted his retaliation claims relating to filing false conduct reports and placement in segregation concerning Pence, Posey, and Lunsford, but failed to exhaust them *prior* to asserting them in his Complaint. (*See* Second Grievance, ECF No. 132

at 15.).  Similarly, Plaintiff exhausted his medical indifference claim against Defendant

Jeffreys, but did not do so *before* he proffered that claim to this Court in his proposed

Amended/Supplemental Complaint on June 13, 2011.  (*See* June 24, 2011 Dec. of Chief Insp.,

ECF No. 132 at 37.)  The remainder of Plaintiff's claims, including his claims against

Defendants Sheets, Heiss, Lisath, Krisher, Price, Turner, Browning, Cockrell, Fuller, Spencer,

Sykes, Barnett, Montgomery, Letts, Leggs, Jones, and his John and Jane Does, were never

properly exhausted.

  The undersigned rejects Plaintiff's contention that he fully exhausted all of his

retaliation claims against Defendants.  Referencing his Fourth Grievance for support, Plaintiff

asserts that he "did not know the names of the defendants involved in the retaliation

campaign—as evidenced by naming them as 'John and Jane Doe' defendants in his original

Complaint—however, Plaintiff did exhaust the issue of retaliation several times."  (Pl.'s Mem.

in Opp. to Defs.' Mot. for Summ. J. 1, ECF No. 140-2.)  First, any retaliation claims raised in

his Complaint must be dismissed as unexhausted because the only grievance Plaintiff had

exhausted at the time he initiated this action was his First Grievance against Warden Jeffreys

concerning the alleged racial segregation policy.  Second, to properly exhaust his grievances

against the individuals allegedly participating in this "campaign of retaliation," Plaintiff was

required to comply with the ODRC's three-step grievance procedure.  *See* Ohio Admin. Code §

5120–9–31.  His Fourth Grievance cannot serve to properly exhaust these claims against RCI

staff because Plaintiff filed this grievance directly against Warden Jeffreys.

  The undersigned likewise rejects Plaintiff's assertion that he is not required to exhaust

his administrative remedies with regard to his retaliation claims because retaliation is not a

condition of confinement.  The Supreme Court has considered and rejected this narrow

interpretation of the PLRA. *Porter*, 534 U.S. at 532 ("[W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); *accord Arflack v. Cty. of Henderson, Ky.*, 412 F.App'x 829, 832 n.4 (6th Cir. 2011) (rejecting inmate's assertion that the PLRA's exhaustion requirements only apply to claims regarding prison conditions affecting everyone).

In sum, the undersigned **RECOMMENDS** dismissal of Plaintiff's unexhausted claims **WITHOUT PREJUDICE**, leaving only the equal protection and retaliation claims that Plaintiff arguably properly exhausted for consideration. The undersigned now considers the merits of these claims.

## B.     Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "In prison housing, the Equal Protection Clause forbids racial classifications absent compelling justifications and a narrowly tailored plan." *Brand v. Motley*, 526 F.3d 921, 924 (6th Cir. 2008) (citing *Johnson v. California*, 543 U.S. 499, 509 (2005)). Although "inmates have no right to preferable housing assignments . . ., an inmate, like anyone else, retains the right to be free from government-sponsored race discrimination unsupported by a compelling interest." *Brand*, 526 F.3d at 924 (citing *Johnson*, 543 U.S. at 508–15) (internal citations omitted); *Wolf v. McDonnell*, 418 U.S. 539, 556 (1974) ("Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race.").

In order to prove an equal protection violation, a plaintiff must prove, through direct or

26

circumstantial evidence, the existence of intentional discrimination, directed at a suspect class. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *Washington v. Davis*, 426 U.S. 229, 239–40 (1976). Put another way, disparate impact alone is insufficient to find a violation of the equal protection clause. Thus, generally, a court will not infer the requisite intent based upon a showing of a statistically disproportionate racial impact of a policy. *McClesky v. Kemp*, 481 U.S. 279, 292 (1987); *U.S. v. Thorpe*, 471 F.3d 652, 660 (6th Cir. 2006). In instances of extreme statistical disparities, however, Courts have inferred discriminatory intent adequate for a prima facie case where the sample size is sufficient and the difference in the expected value and the observed value exceeds two or three standard deviations. *See, e.g.*, *Yick Wo v. Hopkins,* 118 U.S. 356 (1886); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Castaneda v. Partida*, 430 U.S. 482, 498 n.17 (1977); *Rendon v. AT&T Tech.*, 883 F.2d 388, 397–98 (5th Cir. 1989); *Palmer v. Shultz*, 815 F.2d 84, 92 (D.C.Cir. 1987); *Eastland v. TVA*, 704 F.2d 613, 622 n.12 (11th Cir. 1983), *cert. denied*, 465 U.S. 1066 (1984). "But such a finding remains the exceedingly rare exception to the general rule." *Thorpe*, 471 F.3d at 661. If a plaintiff makes a prima facie case of discriminatory purpose, the burden shifts to the defendant to rebut the presumption of unconstitutional action through a showing that legitimate, racially neutral selection criteria produced the disparate impact. *Washington*, 426 U.S. at 241.

As applied to the instant case, to prove an equal protection violation, Plaintiff must demonstrate that Defendants, when making cell assignments, were motivated by racial considerations or that they in fact did assign cells based upon race. Plaintiff contends that the latter is true, alleging that Defendants have an unwritten policy of automatic racial segregation

for all inmates, devoid of any individualized analysis.

In their Cross-Motion for Summary Judgment, Defendants deny that racial segregation is an established policy or practice at RCI. Instead, Defendants assert that RCI adheres to ODRC Policy 64-DCM-03, entitled "Non-Discrimination in Housing and Job Assignments," which states in relevant part:

> It is the policy of the Ohio Department of Rehabilitation and Correction to create an atmosphere of racial equality in the correctional institutions by minimizing even the appearance of segregation. The fostering and creation of integrated housing and job assignments should be accomplished to enhance rehabilitation efforts and serve the security interests of the institution. Inmates shall be assigned without regard to the inmate's race, ethnicity or national origin.

(ODRC Policy 64-DCM-03, ECF No. 129-3 at Ex. 1.) Jeanetta Turner, RCI Count Office Supervisor, whose duties include assigning inmates to cells, denies that a segregation policy exists, stating instead that RCI complies with ODRC Policy No. 64-DCM-03, which requires that inmates be assigned without regard to race, ethnicity, or national origin. (Turner Decl. ¶¶ 3–5, ECF No. 129-2.) Warden Jeffreys, Charlie Heiss, the RCI Warden's Administrative Assistant, and Albert Price, a supervising Lieutenant in an RCI segregation unit, also deny the existence of such a policy. (Heiss Decl. ¶ 5, ECF No. 129-3; Jeffreys Decl. ¶ 4, ECF No. 129-4; Price Decl. ¶¶ 4–5, ECF No. 129-5.) Defendants also offer the July 12, 2010 Correction Institution Committee Report: Inspection and Evaluation of the Ross Correctional Institution ("CIIC Report") in support of their assertion that an unwritten policy of automatic racial segregation does not exist.[1] In this report, the CIIC found that "RCI certainly does not racially segregate as a matter of practice." (July 12, 2010 CCIC Report 14, ECF No. 129-6 at Ex. A-1.)

---

[1]The CIIC is a bipartisan legislative committee that provides oversight to Ohio's prisons and youth services facilities.

Finally, Defendants point out that the existence of such a policy is belied by the July 2010 and December 13, 2010 racial composition charts Plaintiff relied upon in seeking a preliminary injunction. These charts show a significant number of integrated cells.

Defendants acknowledge that the majority of RCI cells are segregated, but explain that this separation caused by the following two factors: (1) RCI's efforts to accommodate inmate requests to be celled together; and (2) RCI's inability to house certain inmates together for reasons of prison security and control. (Turner Decl. ¶¶ 7–11, ECF No. 129-2; Heiss Decl. ¶ 6–9, ECF No. 129-3; Price Decl. ¶¶ 6–9, ECF No. 129-5.) Defendants assert that the former reason is the single largest factor contributing to the appearance of segregation. (*Id.*) Defendants represent that the latter reason contributes to the appearance of segregation because RCI houses known gang members who preach racial superiority and encourage violence against other races and members of other gangs. (*Id.*) Defendants explain that in the interests of safety, security, discipline, and keeping good order in the prison, they cell inmates in a manner that limits gang violence. (*Id.*) They assert that to the extent RCI's policy of individually assessing inmates prior to cell assignment increases the appearance of segregation at RCI, it is an unintentional byproduct of efforts to promote safety. (*Id.*)

Defendants maintain that they are entitled to summary judgment on Plaintiff's equal protection claim because Plaintiff has failed to make a prima facie showing of discriminatory purpose. Defendants alternatively assert that they are entitled to qualified immunity on this claim.

Plaintiff, in his Memorandum in Opposition, responds to Defendants' arguments as follows:

Both the plaintiff and the defendants agree that the vast majority of cells at R.C.I. are racially segregated. There is a genuine dispute between the parties as to the reason behind the racial segregation.

This genuine dispute of material fact prevents a granting on summary judgment.

(Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 9, ECF No. 140-2.)

Plaintiff's conclusory assertion that a genuine issue of material fact exists is not well taken. Rule 56(c)(1) explicitly states that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Plaintiff has failed to properly address Defendants' assertion that RCI does not employ unwritten policy of automatic racial segregation. Indeed, Plaintiff's own exhibits contradict his unsupported allegations that such a policy exists. In addition, Plaintiff's notation that the parties agree that the "vast majority" of RCI cells are racially segregated does create a genuine issue of material fact concerning whether Defendants were motivated by race in making cell assignments. In recommending denial of Plaintiff's motion for a preliminary injunction, which sought an order enjoining Defendants from assigning inmates to cells on the basis of race, the Court rejected Plaintiff's reliance on statistics showing that a majority of cells were segregated as follows:

The racial composition charts upon which Plaintiff relies are inadequate because they offer only raw statistics on the actual values—they do not indicate what the expected values are or tell the Court how many standard deviations the expected values are from the actual values.

*       *       *

Even if, however, the Court assumes that Plaintiff's statistics suffice as evidence of discriminatory effect and a prima facie case of discriminatory intent, the undersigned finds that Defendants have advanced legitimate, non-discriminatory

reasons sufficient to rebut the presumption of unconstitutional action at this juncture. Specifically, Defendants state that any appearance of racial segregation is caused by the following two factors: (1) RCI's efforts to accommodate inmate requests to be celled together; and (2) RCI's inability to house certain inmates together for reasons of prison security and control. Defendants assert that the former reason is the single largest factor contributing to the appearance of segregation. Plaintiff, in an October 13, 2010 Grievance, acknowledges Defendants' efforts to accommodate inmate requests. (Notification of Grievance 4, ECF No. 7-1 ("They allow most other inmates to chose their cellmates.").) Defendants represent that the latter reason contributes to the appearance of segregation because RCI houses known gang members who preach racial superiority and encourage violence against other races and members of other gangs. Defendants explain that in the interests of safety, security, discipline, and keeping good order in the prison, they cell inmates in a manner that limits gang violence. They assert that "to the extent RCI's policy of individually assessing inmates prior to cell assignment increases the appearance of segregation at RCI, it is an unintentional byproduct of efforts to promote safety." (Def's Opp. to Pl.'s Mot. to Supp. 9, ECF No. 49 (internal quotation marks omitted).) Plaintiff acknowledges the existence of such gang violence and has alleged that he has been assaulted by a member of a gang that preaches racial superiority simply because he is an African-American. (Compl. ¶ 15, ECF No. 9.) Defendants' efforts to reduce these incidents of violence is not discriminatory. *See Jones v. Walker*, 358 F. App'x 708, 711 (7th Cir. 2009) (concluding that the prison's efforts to reduce gang violence through cell assignments did not violate the Equal Protection Clause even though it resulted in racial segregation because the prison's policies were based on the prison's legitimate, colorblind concern for prisoner safety).

(April 29, 2011 Report and Rec. 10–11, ECF No. 63 (internal footnote omitted).). Plaintiff has failed to adequately address Defendants' properly supported assertions of fact concerning the existence of the alleged policy and their explanations for why the majority of RCI cells are segregated.

In sum, the undersigned concludes that Defendants have demonstrated that they are entitled to summary judgment on Plaintiff's equal protection claim against Warden Jeffreys. Based upon this conclusion, the undersigned declines to address Defendants' alternative argument, that Warden Jeffreys is entitled to qualified immunity. It is, therefore,

**RECOMMENDED** that the Court **GRANT** summary judgment in favor of Defendants on this

claim.

**C.     Retaliation Claims**

The undersigned likewise recommends that the Court grant summary judgment in

Defendants' favor on the retaliation claims that Plaintiff arguably properly exhausted.

The elements of a First Amendment retaliation claim are:

> "(1) the plaintiff engaged in protected conduct; (2) and adverse action was taken
> against the plaintiff that would deter a person of ordinary firmness from
> continuing to engage in that conduct; and (3) there is a causal connection
> between elements one and two—that is, the adverse action was motivated at least
> in part by the plaintiff's protected conduct."

*Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (quoting *Thaddeus-X v. Blatter*, 175

F.3d 378, 394 (6th Cir. 2000)).

**1.     September 17, 2010 Conduct Report & Segregation**

In his Amended/Supplemental Complaint, Plaintiff alleges that on September 17, 2010,

Lunsford and Posey issued a false conduct report charging him with "dealing," causing him to

be placed in segregation.  Plaintiff maintains that Lunsford and Posey filed the false conduct

report in retaliation for his complaints regarding racial segregation and his filing of this lawsuit.

Defendants deny that they have retaliated against Plaintiff for complaining about racial

segregation.  They assert that Plaintiff cannot succeed on these claims because the evidence

demonstrates that he violated prison regulations.  Specifically, they rely on prison records to

demonstrate that Plaintiff was found guilty of the conduct alleged in the September 17, 2010

conduct report.  Defendants maintain that they are entitled to summary judgment because

Plaintiff has failed to raise any issues of material fact precluding summary judgment on these

claims.  The undersigned agrees.

Even if the Court assumes that Plaintiff has established the first two elements of these

retaliation claims, the undersigned concludes that Plaintiff cannot establish the third element—a causal connection between the protected conduct and the adverse action—for his retaliation claims. For this element, "the subjective motivation of the defendants is at issue." *Thaddeus-X*, 175 F.3d at 399. The *Thaddeus* Court instructed that the analysis of motive in retaliation claims proceeds as follows:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. . . . If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Id*. Here, even if the Court assumes that Plaintiff has submitted evidence of a causal connection, Plaintiff cannot prevail on the merits because Defendants have submitted uncontroverted evidence showing that they would have taken the same action even if he had not engaged in the protected activity. *See Thomas v. Eby*, 481 F.3d 434, 441–42 (6th Cir. 2007) (citation omitted) (holding that even where an inmate establishes that his protected conduct is a motivating factor in the adverse action, the defendant "may thwart the retaliation claim by showing that [he] would have taken the same action even without the protected activity"). Specifically, Defendants have submitted prison documentation demonstrating that Plaintiff was placed into segregation on September 17, 2010, as a result of his behavior in violating prison rules. (*See* Sept. 17, 2010 Conduct Report, ECF No. 49-1 at 13; Sept. 23, 2010 Disp. of RIB, ECF No. 49-1 at 14.) And, because prison officials found him guilty of the underlying misconduct charges, any inference of retaliatory intent is eliminated. *Jackson v. Madery*, 158 F. App'x 656, 662 (6th Cir. 2005) (quoting *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994)) ("A finding of guilt on a misconduct charge based on some evidence of a violation of prison rules 'essentially checkmates [a] retaliation claim.'"); *Wilson v. Wellman*, No. 99-2377, 2000

WL 1829265, at *2 (6th Cir. Dec. 6, 2000) ("[P]rison officials' conclusions that [the plaintiff] was guilty of the underlying misconduct charges satisfies defendants' burden of showing that they would have brought the charges against him even if [the plaintiff] had not filed his grievances and complaints.").

Accordingly, the undersigned **RECOMMENDS** that the Court **GRANT** summary judgment in favor of Defendants on Plaintiff's retaliation claims against Posey and Lunsford concerning their filing of a false grievance report resulting in his placement in segregation on September 17, 2010.

### 2.    Defendant Jeffreys' Threats of Transfer

The undersigned concludes that Defendants are also entitled to summary judgment on Plaintiff's retaliation claim against Defendant Jeffreys relating to his transfer threats. Warden Jeffrey's threats to transfer Plaintiff to another institution, in the absence of proof that the transfer would inhibit Plaintiff's ability to access the courts, does not satisfy the second element of a retaliation claim. A transfer to another prison facility, without the existence of foreseeable consequences inhibiting a plaintiff's ability to access courts, does not qualify as an adverse action. *Siggers–El v. Barlow*, 412 F.3d 693, 701–02 (6th Cir. 2005); *Smith v. Yarrow*, 78 F. App'x 529, 543 (6th Cir. 2003) (quoting *Mandela v. Campbell*, No. 97-5712, 1999 WL 357825, at *3 (6th Cir. May 26, 1999)) ("We have repeatedly held that transfer from one prison to another prison 'cannot rise to the level of an "adverse action" because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights.'").

Plaintiff cannot rely on Warden Jeffrey's alleged threat to transfer him or his alleged characterization of Plaintiff as "high maintenance" to hold him liable for the alleged unconstitutional conduct of RCI staff. In order to plead a cause of action under § 1983, a

plaintiff must plead two elements: "(1) deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008) (citing *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006)). To sufficiently plead the second element, a plaintiff must allege "personal involvement." *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) (citation omitted). This is because "§ 1983 liability cannot be imposed under a theory of *respondeat superior*." *Id.* (citation omitted). A supervisor is not liable under § 1983 "unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009) (internal quotation omitted). Put another way, to hold a supervisor liable under § 1983, a plaintiff "must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . ." *Id.* Applied here, the undersigned concludes, as a matter of law, that Warden Jeffrey's alleged transfer threat or reference to Plaintiff as "high maintenance," does not constitute the requisite active engagement in unconstitutional behavior. *See Siggers*, 652 F.3d at 695 (affirming trial court's dismissal of inmate's claim against warden where the inmate failed to allege sufficient personal involvement by warden in subordinate's unconstitutional behavior).

For these reasons, the undersigned finds that this claim is without merit. It is, therefore, **RECOMMENDED** that the Court **GRANT** summary judgment in favor of Defendants on this claim.

**D.      Plaintiff's Motion for Contempt**

Plaintiff's Motion for Contempt is **DENIED**.  "[C]ivil contempt orders impose remedial damages and sanctions intended to coerce compliance with court orders."  *Joy & Middlebelt Sunoco, Inc. v. Fusion Oil, Inc.*, 179 F. App'x 301, 303–04, (6th Cir. 2006).  In addition, "[p]roceedings for civil contempt are between the original parties, and are instituted and tried as part of the main cause."  *Gombers v. Buck's Stove & Range Co.*, 221 U.S. 418, 444–45 (1911).  In this case, there has been no violation of a Court order.  Moreover, Plaintiff's Motion seeks relief against individuals who are not parties to this action and concerns conduct that occurred at TCI and AOCI.  Thus, there is no basis for imposing civil contempt here.

**IV.      CONCLUSION**

For the reasons set forth above, Defendants' Motion to Strike (ECF No. 146) and Plaintiff's Motion for Contempt (ECF No. 150) are **DENIED,** and Plaintiff's Request for Leave (ECF No. 147) is **GRANTED**.  In addition, the undersigned **RECOMMENDS** that the Court **DENY** Plaintiff's Motion for Partial Summary Judgment (ECF No. 114) and **GRANT** Defendants' Cross-Motion for Summary Judgment (ECF No. 129), granting judgment on the merits in Defendants' favor on those claims Plaintiff arguably exhausted and dismissing the remainder of the claims without prejudice for failure to properly exhaust administrative remedies.

**V.      PROCEDURE ON OBJECTIONS**

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816*, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: August 15, 2012                                    _____/s/ *Elizabeth A. Preston Deavers*_____
                                                               Elizabeth A. Preston Deavers
                                                               United States Magistrate Judge